**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ROCK AIRPORT OF PITTSBURGH, LLC,
ET AL.,

<table>
<tr><td></td><td>14cv0091</td></tr>
<tr><td>Appellant,</td><td>**ELECTRONICALLY FILED**</td></tr>
</table>

v.

MANAGEMENT SCIENCE ASSOCIATES,
INC.,

Appellee.

**MEMORANDUM OPINION**

Appellants, Rock Airport of Pittsburgh, LLC, and RPP, LLC (hereinafter, "Rock Airport"
and "RPP," respectively) filed an Appeal from the Bankruptcy Court's December 3, 2013 Order
claiming the Bankruptcy Court abused its discretion in several ways and made clearly erroneous
findings of fact. Appellee, Management Science Associates, Inc. (hereinafter "MSA"), disputes
that the Bankruptcy Court made clearly erroneous factual findings and contends the Court did
not abuse its discretion in any way. This matter has been fully briefed by the parties and is now
ripe for adjudication.

**I. Jurisdiction and Standard of Review**

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a). A district
court sits as an appellate court in bankruptcy proceedings. *In re Michael,* 699 F.3d 305, 308 n.2
(3d Cir. 2012).

The standards of review which apply to this case are as follows:

First, this Court cannot disturb the factual findings of a bankruptcy court unless they are clearly erroneous. *In re Gray,* __ Fed. Appx.___, 2014 WL 889355 at *3 (3d Cir. March 7, 2014); *see also Accardi v. IT Litig. Trust (In re IT Group, Inc.)*, 448 F.3d 661, 667 (3d Cir. 2006). A factual finding is "clearly erroneous" if the reviewing court is "left with a definite and firm conviction that a mistake has been committed." *In re W.R. Grace & Co.*, 729 F.3d 311, 319, n.14 (3d Cir. 2011); *see also Gordon v. Lewistown Hosp.*, 423 F.3d 184, 201 (3d Cir. 2005). Under the clearly erroneous standard, it is the responsibility of an appellate court to accept the ultimate factual determinations of the fact-finder unless that determination is either (1) completely devoid of minimum evidentiary support displaying some hue of credibility or (2) bears no rational relationship to the supportive evidentiary data." *DiFederico v. Rolm Co.*, 201 F.3d 200, 208 (3d Cir. 2000) (citations omitted).

Second, this Court exercises plenary, or *de novo*, review over any legal conclusions reached by the bankruptcy court. *In re Ruitenberg*, ___ F.3d ___, 2014 WL 959485 at *2 (3d Cir. March 13, 2014); *see also Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999).

Third, if the Bankruptcy Court's decision is a mixed question of law and fact, this Court must break down the determination and apply the appropriate standard of review to each. *In re Montgomery Ward Holding Corp.*, 326 F.3d 383, 387 (3d Cir. 2003). The Court should "apply a clearly erroneous standard to integral facts, but exercise plenary review of the court's interpretation and application of those facts to legal precepts." *In re Nortel Networks, Inc.*, 669 F.3d 128, 137 (3d Cir. 2011) (citation omitted).

Finally, this Court reviews a bankruptcy court's exercise of discretion for abuse. *In re Friedman's Inc.,* 738 F.3d 547, 552 (3d Cir. 2013). A bankruptcy court abuses its discretion

when its ruling rests upon an error of law or a misapplication of law to the facts. *In re O'Brien Environmental Energy, Inc.*, 188 F.3d 116, 122 (3d Cir. 1999).

## II. Factual and Procedural History

### A. Summary of the Facts

In a nutshell, the issues raised by Rock Airport and RPP in this appeal arise from the following facts: (1) MSA purchased property from Rock Airport and utilized RPP for its electrical needs with respect to that property; (2) MSA's electrical needs were such that, over time, RPP either could not or would not accommodate MSA's needs, and on several occasions (and at least once in violation of a Court Order), RPP cut off MSA's electrical power; and (3) there came a time when the parties agreed that MSA should migrate from RPP's electrical system to West Penn Power's system, but RPP contends that this migration did not occur in a timely fashion and was in contravention of a Court Order. Ultimately, the Bankruptcy Court required Rock Airport to grant an easement to MSA so that a power line from MSA's building(s) to West Penn Power's electrical system could be installed thereby enabling MSA's electrical migration from RPP to West Penn Power to occur.

### B. Factual and Procedural History

This Court has detailed below the procedural history (which emanated from Orders entered in both the Court of Common Pleas of Allegheny County ("State Court") and the Bankruptcy Court for the Western District of Pennsylvania ("Bankruptcy Court")) from which the above-mentioned relevant facts were born.

Rock Airport was acquired in the late 1990s by Mr. Rock Ferrone. After acquiring the airport, Ferrone developed a business park ("Rockpointe Business Airpark") and in September of

2000, sold some the property within Rockpointe Business Airpark to MSA. MSA purchased this property for the purpose of constructing a data center. MSA used the property purchased from Ferrone to construct a 42,000 square-foot data center which operates on a 24/7/365 schedule. MSA's data center provides back-up support and services to the computer information systems of its clients, in the event of its clients' own system failures.

Around the time that MSA purchased this property from Ferrone, Ferrone created RPP which, in 2002, became MSA's sole supplier of electricity. RPP also supplied electricity to other tenants and owners at Rockpointe Business Airpark. After connecting to the RPP electrical system in 2002, MSA increased its electrical needs in 2004, and again in 2008.

### 1. Electrical/Power Loss - 2008

Because of the increasing amount of electricity MSA needed, in 2008, RPP either could not or would not supply power to MSA and terminated MSA's power. MSA filed a lawsuit seeking injunctive relief in the Court of Common Pleas of Allegheny County (docket no. GD 08-8520, hereinafter "State Court") against Rock Airport and RPP. On April 30, 2008, the State Court granted MSA preliminary injunctive relief, thereby requiring RPP to restore electrical power to MSA. *MSA v. Rock Airport*, Court of Common Pleas of Allegheny County, Pennsylvania, GD 08-8520, doc. no. 4.

On July 11, 2008, the parties in the State Court case entered into a Consent Order which, *inter alia,* required RPP to continue to provide MSA with electrical power, but MSA was to limit its consumption and migrate off RPP's system to West Penn Power's [f/k/a Allegheny Power] system, "as commercially soon as possible." *Id*., doc. no. 13. This Consent Order further indicated the "parties acknowledge that to migrate to Allegheny Power may require an easement from [Rock Airport]. [Rock Airport] will grant such easement to Allegheny Power . . . provided

they are consistent with the overall development of the [Rockpointe Business] Airpark . . . ." *Id.*, doc. no. 13.

On April 30, 2009, Rock Airport filed for Chapter 11 bankruptcy, automatically staying the aforementioned State Court proceedings. MSA's migration from RPP to West Penn Power did not occur before Rock Airport filed for bankruptcy.

### 2. Electrical/Power Loss - 2011

In July of 2011, RPP shut off the electrical power to MSA. MSA filed an adversary proceeding in the bankruptcy case on July 15, 2011 to restore its power. *MSA v. Rock Airport*, United States Bankruptcy Court, Western District of Pennsylvania, no. 11-02361, doc. no. 1. On October 14, 2011, a Consent Order was reached in the adversary bankruptcy case dismissing the adversary proceeding, but granting MSA relief from the automatic stay in the State Court case, thereby allowing litigation to resume in State Court. *Id.,* doc. no. 18.

### 3. Electrical/Power Losses – 2012

Starting on February 17, 2012, and continuing throughout much of 2012, while the State Court litigation was still proceeding, MSA experienced interruptions in its electrical power supplied by RPP. On April 2, 2012, the State Court ordered, *inter alia*, Rock Airport and RPP to immediately restore MSA's power. *MSA v. Rock Airport*, Court of Common Pleas of Allegheny County, Pennsylvania, GD 08-8520, doc. no. 37. On April 3, 2008, Rock Airport and RPP filed a Notice of Appeal of the April 2, 2012 Court Order. *Id.*, doc. no. 38.

Rock Airport and RPP throughout the litigation in 2012 claimed that MSA's operation of one of its transformers was unlawful and/or unsafe, and filed an emergency motion to that effect. *Id.*, doc. no. 64. The State Court denied Rock Airport's and RPP's emergency motion. *Id.*, doc. no. 72. In addition to Rock Airport and RPP's emergency motion, MSA filed its own emergency

motion, seeking a Court Order precluding Rock Airport and RPP from terminating its electrical service, claiming that RPP was charging MSA $30,000 in "administrative/legal/equipment rental" fees for which there was no substantiation. *Id.*, doc. no. 94. On November 28, 2012, the State Court barred Rock Airport and RPP from terminating electricity without a Court Order. *Id.*, doc. no. 97.

On December 28, 2012, Rock Airport and RPP filed a Motion in State Court seeking authorization to terminate MSA's electrical power, claiming MSA had not fully paid its prior electrical invoices.[1] On February 28, 2013, the State Court entered two Orders: one granted MSA's motion to compel the deposition of Ferrone, Rock Airport, and RPP; the other denied Rock Airport's motion for recusal of Judge Ward.

### 4. Electrical/Power Losses – 2013

Shortly after entry of these Orders on February 28, 2013, RPP terminated electrical service to MSA without first obtaining a Court Order in contravention of the November 28, 2012, State Court Order.

As a result of the February 28, 2013 interruption of power, on March 1, 2013, MSA initiated a new adversary proceeding (docket no. 13-02078) in Bankruptcy Court. The Bankruptcy Court entered an Order dated March 2, 2013, requiring, *inter alia,* RPP to reconnect electrical service within 24 hours in accordance with the July 11, 2008 State Court Consent Order, and MSA to "complete the transfer of electric service from RPP to [West Penn] Power" within 90 days from March 2, 2013. *MSA v. RPP, LLC*, United States Bankruptcy Court, Western District of Pennsylvania, no. 13-02078, doc. no. 6. On March 4, 2013, RPP filed a Motion asking the Bankruptcy Court to reconsider its March 2, 2013 Order and/or terminate the

---

[1] A hearing on this motion was scheduled for March 5, 2013, but at Rock Airport's request, the hearing was postponed by the State Court "to a date to be determined."

July 11, 2008 State Court Consent Order. *Id.*, doc. no. 5. Throughout the month of March, 2013 the parties fought over how much MSA owed RPP for power versus "administrative fees" and whether the migration was occurring.

On April 24, 2013, the Bankruptcy Court entered a Consent Order: (1) staying two on-going adversary proceedings (nos. 13-02078 and 13-02158); (2) staying the 90-day electricity migration time frame established by the Court's prior March 2, 2013 Order; (3) requiring the parties to comply with the July 11, 2008 State Court Order; and (4) instructing the Trustee to work with MSA to utilize the DQE easement for the installation of MSA's line to a new electrical system RPP to pay West Penn Power a fee to commission a design study for the placement of the electrical system to MSA's facility. *Id.*, doc. no. 59. On May 31, 2013, the Bankruptcy Court modified the April 24, 2013 Consent Order, which ordered in relevant part: (1) RPP was ordered to pay the $10,000 fee sought to be charged by West Penn Power for a design study regarding placement for MSA's electrical system; (2) the completed design study was to be filed in the main bankruptcy case by the trustee; and (3) the parties were to agree to one of the designs established by the West Penn Power study for the migration, but if the parties could not agree then Order indicated that the Court would chose the design.[2] *Id.*, doc. no. 65.

Once the study was filed in the main bankruptcy case (case no. 09-23155), MSA filed a Motion to Order Implementation of West Penn Power's Design Plan. Doc. no. 424. The Bankruptcy Court held a status conference on September 10, 2013 and discussed MSA's Motion to Order Implementation of West Penn Power's Design Plan with the parties.

On December 3, 2013, the Bankruptcy Court issued its Opinion and Order on MSA's Motion to Implement West Penn Power's design plan in the main bankruptcy case (no. 09-

---

[2] The May 31, 2013 Order was modified to provide clarification for West Penn Power's benefit on July 18, 2013. *Id.*, doc. no. 79.

23155) as well as in the two on-going adversary proceedings (nos. 13-02078 and 13-02158).

That Opinion and Order granted MSA's Motion to implement the West Penn Power Design Plan.

Rock Airport and RPP appealed the Bankruptcy Court's December 3, 2013 Order which required Rock Airport to grant an easement to West Penn Power Company ("West Penn") so that MSA could obtain power through West Penn, as opposed to RPP. *MSA v. RPP, LLC*, United States Bankruptcy Court, Western District of Pennsylvania, no. 13-02078, doc. no. 112.


**III. Discussion**

Rock Airport and RPP have appealed the Bankruptcy Court's December 3, 2013 Order claiming: (1) the Court abused its discretion by entering the Order primarily claiming the process that led to this Order was improper under *Stern v. Marshall,* __ U.S. __, 131 S.Ct. 2594 (2011); and (2) the Court's conclusions were clearly erroneous.

**A.     Abuse of Discretion**

As noted above, this Court reviews a Bankruptcy Court's exercise of discretion for abuse. *In re Friedman's Inc.,* 738 F.3d 547, 552 (3d Cir. 2013). A Bankruptcy Court abuses its discretion when its ruling rests upon an error of law or a misapplication of law to the facts. *In re O'Brien Environmental Energy, Inc.*, 188 F.3d 116, 122 (3d Cir. 1999). Here, Rock Airport and RPP primarily argue that the Bankruptcy Court failed to follow the process set forth by the United States Supreme Court in *Stern*.

In *Stern*, a plurality of the Supreme Court explained that the Bankruptcy Court did not have the authority to rule on a specific matter, because the Bankruptcy Court lacked the Constitutional authority to adjudicate that particular matter. The matter at issue in *Stern* was a counterclaim brought as an adversary proceeding by a widow in her Chapter 11 case to recover

damages for her stepson's alleged tortious interference with her expectancy of an inheritance or gift from her deceased husband. The Supreme Court, in *Stern,* held that the Bankruptcy Court lacked the authority under Article III of the Constitution to enter final judgment on the widow's counterclaim; rather, the Supreme Court determined that the Bankruptcy Court had to enter proposed findings of fact and conclusions of law on the matter so that the District Court could issue a final ruling on the matter.

This Court finds that the *Stern* decision was predicated upon a set of facts and a procedural history whereby the Bankruptcy Court attempted to enter a final judgment on a state-law based tort, brought as a counterclaim to a proof of claim. Despite the cogent arguments advanced by Rock Airport and RPP, this Court disagrees that the set of facts of history of the instant case is akin to *Stern*, and therefore, concludes that the Bankruptcy Court was not bound by *Stern.* Moreover, given the set of facts and procedural history here (as recounted above), this Court finds that the Bankruptcy Court did possess the Constitutional authority to issue a final judgment because Rock Aiport and RPP consented to same as be will discussed in greater detail below.

### 1. "Core" versus "Non-Core" Proceedings

Congress enumerated sixteen different proceedings which determine whether a matter is a "core" proceeding. 28 U.S.C. §157(b)(2). Of those sixteen, and important to the matter at hand, the following "core" proceeding descriptions are relevant:

(2) Core proceedings include, but are not limited to—

(A) matters concerning the administration of the estate;

\*      \*      \*

(K) determinations of the validity, extent, or priority of liens;

28 U.S.C. §157(b)(2).

If a proceeding is indeed a "core" proceeding, then, as Chief Justice Roberts succinctly noted in *Stern,* "[b]ankruptcy judges may hear and enter final judgments in 'all core proceedings arising under title 11, or arising in a case under title 11.'" 131 S.Ct. at 2603, citing 28 U.S.C. § 157(b)(1).

"Non-core" proceedings are defined as, "a proceeding that is not a core proceeding but . . . is otherwise related to a case under title 11." 28 U.S.C. §157(c)(1). Whenever the matter is not a core proceeding, "the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." *Ibid.* Simply stated, the Bankruptcy Judge must issue proposed findings and conclusions of law for the District Court to consider, in lieu of issuing a final judgment.

However, the parties to a "non-core" proceeding can consent to the Bankruptcy Court treating a matter as if it were a core proceeding, thereby enabling the Bankruptcy Court to enter final judgment on the matter. 28 U.S.C. § 157(c)(2). Consent need not be express, but rather, can be implied. See, *e.g.*, *In re Bartock*, 398 B.R. 135, 152-3 (W.D. Pa. 2008) ("When parties stipulate to the settlement of an action they thereby consent to the exercise of the court's power to compel compliance."); *In re Winstar Communications, Inc.,* 348 B.R. 234, 250 (D.Del. 2005) ("Consent may be implied from failure to object or from any act indicating a willingness to have the bankruptcy court determine a claim.")(citation omitted).

### 2. Core Proceeding

As noted by the parties, the Bankruptcy Court normally deems a matter to be a "core" or "non-core" proceeding. Because that did not occur here, this Court undertook a review of all of the proceedings – both in the State Court and Bankruptcy Court.

As noted by MSA in its Brief in Opposition, and as this Court has confirmed from its own detailed review of the adversary docket entries and transcripts, the Bankruptcy Court did not declare whether this matter was a "core" or a "non-core" proceeding. Rock Airport and RPP have interpreted December 3, 2013 final judgment to have erroneously arisen out of a non-core proceeding, while MSA believes the judgment arose out of a core proceeding.

MSA relies on a case from the Northern District of Illinois to convince this Court that the matter of granting MSA and/or West Penn an easement on Rock Airport property was a core issue because this decision would impact "the validity, extent, or priority of liens" and thus fall under 28 U.S.C. §157(b)(2)(K). Additionally, MSA argues that because the granting of an easement could encumber the real property of Rock Airport, and in doing so impact the administration of the estate, the adversary proceeding at issue was "core" under 28 U.S.C. §157(b)(2)(A).

This Court agrees that the adversary case which gave rise to the December 3, 2013 Order was a "core" proceeding. The December 3, 2013 Order will impact the administration of the estate because as it creates an encumbrance upon Rock Airport's real property.

As noted in the fact section above (see section "II." infra.), a loss of electrical power caused MSA to file a lawsuit in State Court seeking a remedy to the problem that was created by MSA's usage and RPP's lack of ability or desire to continue to provide electricity to MSA. This lawsuit incepted prior to Rock Airport filing for bankruptcy, and resumed in the State Court once

the automatic stay was lifted. However, although the parties in State Court quickly and readily agreed to MSA's migration from RPP to West Penn Power, after nearly six years of litigation in State Court, the migration had not occurred, but multiple violations of the State Court's interim Orders had.

Once the matter came before the Bankruptcy Court as an adversary matter, the sole issue was how to effectuate the parties July 11, 2008 State Court Consent Order, which potentially required an easement on Rock Airport land, thereby encumbering the estate, so that MSA could migrate from RPP to West Penn Power's electrical system. This Court sees this very discrete issue as one which squarely falls under 28 U.S.C. §157(b)(2)(A), given the facts of this case and the impact the granting of an easement and encumbrance of real property can have on the administration of the estate. Thus, the adversary proceeding from which the December 3, 2013 decision arose, was "core."

### 3. Non-Core Proceeding

Alternatively, even accepting Rock Airport's and RPP's position that the adversary proceeding was a non-core proceeding, this Court finds that Rock Airport and RPP agreed to treat the matter as if it were a core proceeding, thereby enabling the Bankruptcy Court to enter final judgment through its December 3, 2013 Order.

As noted above, this Court has spent considerable time reviewing the docket submissions and transcripts from the adversary proceeding that culminated in the December 3, 2013 Order of Court. To that end, this Court notes that hearings before the Bankruptcy Court were held on March 22, 2013, April 5, 2013, May 23, 2013 and May 30, 2013. During the course of these of hearings, the Bankruptcy Court and the parties determined that West Penn Power should determine where the electrical line should be placed so that MSA could migrate from RPP's

system. There is no dispute that MSA's migration from RPP's system was an important piece of the July 11, 2008 State Court Consent Order. Likewise there is no dispute that migration did not occur at any time from July 11, 2008 (the date of the State Court Consent Order) up to December 3, 2013 (the date of the Bankruptcy Court Order now on appeal).

Although there is no "affirmative" or "affirming" language uttered by counsel for Rock Airport or RPP during any of these hearings specifically stating that this adversary proceeding could be considered a "core" proceeding Rock Airport and RPP actively participated in this proceeding. In fact, their counsel played an active role in the decision to have West Penn Power conduct a study to determine where the electrical line should be placed. During the May 30, 2013 hearing, Rock Airport and RPP's "special counsel" unequivocally stated, " . . . we ought to let West Penn Power figure out what the best way they . . . can deliver power to MSA. . . . Let West Penn Power say how MSA can get its service . . . because that's what we agreed to in 2008 and that's what we'd like to [see] happen." *MSA v. RPP, LLC,* United States Bankruptcy Court, Western District of Pennsylvania, no. 13-02078, doc. no. 71.

In addition to these statements made by their own special counsel during the May 30 hearing, on May 31, 2013, the Bankruptcy Court clarified its April 24, 2013 Order which stated in pertinent part:

> Regarding this court's order of April 24, 2013, IT IS Further Ordered:
>
> 1 - so as to facilitate the transition in power delivery going to Management Science Associates, Inc. (MSA) from RPP, LLC, to West Penn Power, the Debtor RPP, LLC, shall pay the $10,000 fee sought to be charged by West Penn Power (and may pay up to an additional $5000 without further order) so that West Penn Power will commission a design study regarding placement for the electrical system to MSAs facility; and
>
> 2 - all parties shall cooperate with West Penn Power in the effort to accomplish the design study; and

3 - not later than August 5, 2013, the design study and any report based thereon shall be shared by West Penn Power with the Debtors RPP, LLC and Rock Airport of Pittsburgh, Trustee Cardiello, MSA; . . . and;

4 - Trustee shall file a copy of the design study and report in the Rock Airport case (which may be filed under seal if necessary); and

\*       \*       \*

7 - one of the West Penn designs shall be utilized to accomplish the transition ordered by this court. That design shall be selected by the parties but if they are unable to reach a consensus, then by the court which shall choose based on, inter alia a design that (a) puts the meter required for this change onto MSAs property on the east side of the runway, and (b) provides for a system that does not require installation underneath the active runway, and (c) is the most functionally useful, and (d) is the most cost effective in terms of dollars to be expended and length of time to complete the transition of providing power to MSA from RPP to West Penn Power, and (e) will accomplish the full transition from RPP to West Penn Power within 180 days of the beginning of work.

*Id.*, doc. no. 65.

On June 13, 2013, MSA filed a Motion for Clarification, or Reconsideration of the above

May 31, 2013 Order, set forth above. *Id.*, doc. no. 73. Rock Airport and RPP filed a Response

to MSA's Motion which states in pertinent part:

I. PRELIMINARY STATEMENT

\*       \*       \*

2.       . . . [t]he design study was suggested by special counsel for RAP and RPP, as a possible means by which the controversy in the above matter could be finally resolved.

3.       . . . [Rock Airport] and RPP admit that the Court's discussions that weight would be placed upon the WPP Design Study. RAP and RPP believe that the Court's Order following the hearing and discussions represent the Court's considered conclusion on the matter.

\*       \*       \*

11.       . . . [Rock Airport]'s concerns are valid and consistent with MSA's agreement in the Order of July 11, 2008 in which [Rock Airport] agreed to provide [West Penn Power, f/k/a/] Allegheny Power with an easement to allow it

to provide direct power to MSA consistent with the development of [Rock Airport] Business Park and the concerns of [Rock Airport] are genuine in that regard.

\* \* \*

WHEREFORE, RAP and RPP respectfully request that the Court deny the Motion for Clarification or, in the alternative, Motion for Reconsideration.

*Id.*, doc. no. 77.

On July 18, 2013, the Bankruptcy Court denied MSA's Motion for Reconsideration of the May 31, 2013 Order, but it did clarify the May 31, 2013 Order in relevant part as follows:

2. To the extent that West Penn Power or any other party misconstrued the [May 31, 2013] Order to require that any proposed design plan must meet *all* of the criteria set forth in paragraph 7 of [that] Order in order to be considered a viable design plan, it cannot be determined prior to the conclusion of the design study whether any design plan can meet all of the criteria listed as Judge Fitzgerald clearly indicated on the record. Therefore clarification is necessary so as to permit West Penn Power to proceed with its design study regarding placement of the electrical system to MSA's facility. As clearly provided in Paragraph 7, the criteria set forth therein will be applied by the Court in selecting a plan in the event that West Penn Power provides more than one design pan and the parties are unable to reach a consensus in selecting one to be implemented.

*Id.*, doc. no. 79. Neither Rock Airport nor RPP raised any objection to this Clarification Order.

In accordance with these Orders, West Penn Power conducted its design study, and on August 23, 2013, the Trustee filed West Penn Power's proposed design on the main bankruptcy docket, again, in accordance with these Orders. Neither Rock Airport nor RPP raised any objection to these proceedings. It was only after MSA filed a Motion to Implement the Proposed West Penn Power Design that Rock Airport and RPP raised any objection. Their objection was based on their assertion that the proposed design, if implemented, was "inconsistent" with the planned expansion of the airport runway and other planned future development modifications. Rock Airport and RPP did not challenge the Bankruptcy Court's authority to enter an Order on MSA's Motion to Implement. To the contrary, Rock Airport and

15

RPP spent their time and energy arguing against the substance of the matter, not the lack of procedure or jurisdiction.

This Court concludes, after reviewing all of the relevant docket entries and transcripts, that the following actions taken by Rock Airport and RRP signified their consent to the Bankruptcy Court treating this matter as a "core" proceeding: (1) it was Rock Airport and RPP's counsel's suggestion to let West Penn Power determine the best place to lay an electrical line to service MSA; (2) the statements made by Rock Airport and RPP in their Response to MSA's Motion for Modification of the May 31, 2013 Order; and (3) the statements made by Rock Airport and RPP's counsel during the May 30, 2013 hearing. In addition, the Court notes that the inaction of Rock Airport and RPP – such as the failure to raise this jurisdiction issue at any point prior to this appeal – especially when contrasted to their active participation in the underlying adversary proceeding, further convinces this Court that Rock Airport and RPP, consented to treating this matter as "core."

Finally, it appears to this Court that Rock Airport and RPP are disingenuously attempting to argue the Bankruptcy Court's lack of jurisdiction (as discussed in *Stern*), especially after spending nine months zealously advancing their position that West Penn Power should conduct its design study so as to "suggest" where the best placement of the electrical line should lay, and after specifically stating "[t]he design study was . . . a possible means by which the controversy in the . . . matter could be finally resolved." As noted above, Rock Airport and RPP, both orally and in writing, provided the requisite consent – albeit implied – to the Bankruptcy Court's authority to enter final judgment on this matter. Accordingly, this Court finds that the Bankruptcy Court did not abuse its discretion in entering the December 3, 2013 Order as a final judgment.

### 4. The July 11, 2008, State Court Consent Order

Next, Rock Airport and RPP contend that the Bankruptcy Court's December 3, 2013 Order "improperly modifie[d]" that State Court's July 11, 2008 Consent Order.[3]  Rock Airport and RPP contend that this "improper modification" violates the *Rooker-Feldman* doctrine.  The Court disagrees.

First, the *Rooker-Feldman* doctrine, only applies when four requirements are met: (1) the federal plaintiff loses in state court; (2) the plaintiff complains of injuries caused by the state-court judgments; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments.  *Day v. Florida,* 743 F.3d 40, 42 (3d Cir. 2014) (internal quotes and citation omitted).  Here, none of the four criteria have been met.  In fact, there has not been a final judgment in State Court.  Thus, the Bankruptcy Court's December 3, 2013 Order does not violate the *Rooker-Feldman* doctrine.

Next, the July 11, 2008, State Court Consent Order has not been "improperly modified" by the December 3, 2013 Bankrutpcy Court Order.  The handwritten State Court Consent Order states in pertinent part:

> (6)(1) MSA will continue its planning and will act as commercially soon as possible to shift, its electrical usage to [West Penn f/k/a] Allegheny Power.

> (6)(2) The parties acknowledge that to migrate to [West Penn f/k/a] Allegheny Power may require an easement from defendant [Rock Airport]. Defendant [Rock Airport] will grant such easement to [West Penn f/k/a] Allegheny Power to facilitate MSA's plans provided that the easements provided they are consistent with the overall development of the Park  . . .

---

[3] The Court believes subsection "III. A. 1." of this Memorandum Opinion, above, adequately addresses and encompasses the issue raised by Rock Airport and RPP in their appellate brief (doc. no. 6, pp. 20-22) relating to the "propriety" of the Bankruptcy Court's orders entered prior to December 3, 2103 in *MSA v. RPP, LLC*, United States Bankruptcy Court, Western District of Pennsylvania, no. 13-02078, and thus, no further discussion on that issue is required or warranted.

*MSA v. Rock Airport*, Court of Common Pleas of Allegheny County, Pennsylvania, GD 08-8520, doc. no. 13.

As noted, the Bankruptcy Court held several hearings before entering its December 3, 2013 Order. This Court's review of those transcripts and the Memorandum Opinion issued by the Bankruptcy Court contemporaneously with its December 3, 2013 Order evidences the Bankruptcy Court's consideration of the impact of the line on the purported future development of Rock Airport and the Park. Notably, the Bankruptcy Court's Opinion states, "[T]here is no credible testimony that the implementation of the [West Penn Power] design would interfere with the overall development of the Business Park." *MSA v. RPP, LLC,* United States Bankruptcy Court, Western District of Pennsylvania, no. 13-02078, doc. no. 111, p. 13.

This Court concurs that Rock Airport and RPP failed to provide credible testimony on this point. Accordingly, there is no conflict – let alone an "improper modification" – to the State Court's July 11, 2008 Consent Order, and thus, the Bankruptcy Court did not abuse its discretion by entering the December 3, 2013 Order.

### 5. West Penn Power's Singular Design

Rock Airport and RPP also contend that the Bankruptcy Court required West Penn Power to provide more than one design for the placement of the electrical line, yet approved West Penn Power's Design Study which only contained a single design option. Rock Airport and RPP claim that the December 3, 2013 Order which implements the singular design option constitutes an abuse of discretion.

However, the Bankruptcy Court also thoroughly addressed this issue in its contemporaneously issued Memorandum Opinion. The Bankruptcy Court, after quoting from a hearing transcript, noted: "The Court did not explicitly require West Penn Power to produce a

certain number of design options to consider." *Id.*, p. 14. The Bankruptcy Court also stated that it did not require West Penn Power to consult with Rock Airport or RPP before or during its design study, and further noted that Rock Airport and RPP do not contend that they were precluded from providing information to West Penn Power. Furthermore, the Bankruptcy Court stated:

> Instead, after an approximately seventy-five day, ten-thousand dollar design study was completed, [Rock Airport and RPP] now ask for a new design to accommodate a factor that could have been raised in a timely manner. . . . Had [Rock Airport and RPP] offered their full cooperation, they would have found a way to provide West Penn Power with all relevant information. Under the circumstances, it is extremely difficult to understand why [Rock Airport and RPP] did not provide notice of the potential for expansion of the runway when [Rock Airport and RPP] now assign such significance to it. . . . Furthermore, it has not been established that the implementation of the [West Penn Power] Design *precludes* the option to expand the runway in the future.

*Id.,* Doc. no. 111, p. 14-15 (emphasis in original).

In light of these comments, as well as this Court's review of the hearing transcripts, this Court finds that the Bankruptcy Court carefully considered the assertions made by Rock Airport and RPP concerning the impact the singular design plan would have on the potential future plan for runway (and Park) expansion. This Court unequivocally concurs that if Rock Airport and RPP were genuinely concerned about their potential future development plans, they could have and would have apprised West Penn Power of those plans without being ordered to do so. Further, there is nothing in the record to suggest that Rock Airport and RPP were estopped by the Bankruptcy Court from providing West Penn Power with information concerning any potential expansion plans or ideas. Accordingly, the Court finds that the Bankruptcy Court did not abuse its discretion by entering the December 3, 2013 Order allowing West Penn Power and MSA to implement the electrical line design plan.

### 6. MSA's CEO, Alfred Keuhn

Rock Airport and RPP's final argument claiming the Bankruptcy Court abused its discretion by entering the December 3, 2013 Order also fails. Rock Airport and RPP claim the Bankruptcy Court abused its discretion by quashing the subpoena that they served upon Alfred Keuhn, MSA's CEO, in order to "authenticate his emails" which were introduced when Mr. Ferrone testified. Rock Airport and RPP's Brief before this Court argues that Mr. Keuhn would have established "more emphatically" that MSA had knowledge of Rock Airport and RPP's proposed expansion plans. Doc. no. 6, p. 32. Rock Airport and RPP admit that MSA agreed, in front of the Bankruptcy Court, that there was a plan to expand the runway. Id.

Denying Rock Airport and RPP the ability to "more emphatically" argue anything is not an abuse of discretion. Rock Airport and RPP cite no law to support their entitlement to argue "more emphatically."

Moreover, as noted above, if the expansion of the runway was such an important, hot-button issue for Rock Airport and RPP, again, then they should have made those expansion plans known to West Penn Power before or during the time West Penn Power conducted its design study. It was not incumbent upon their opponent (MSA) of six years to inform West Penn Power of Rock Airport's potential expansion.

Accordingly, the Court declines to find that the Bankruptcy Court abused its discretion in this regard.

### B.     Clearly Erroneous

The bases upon which Rock Airport and RPP predicate their arguments that the December 3, 2013 Order of the Bankruptcy Court was "clearly erroneous" generally stem from the same arguments they advance in the "Abuse of Discretion" section. See doc. no. 6, pp. 33-

44. In sum, Rock Airport and RPP: (1) accuse West Penn Power of colluding with MSA to develop a singular path for the proposed electrical line instead of "fully evaluating all possible routes[;]" (2) argue that West Penn Power's design plan is not consistent with their future plans for the runway and Park; and (3) claim that moving West Penn Power's proposed electrical line in the future should the expansion proceed as "planned" is not an option.[4]

As this Court has expressed throughout the body of this Memorandum Opinion, above, the Bankruptcy Court thoughtfully and carefully considered the evidence before it and rendered a sound decision as explained in its Memorandum Opinion which accompanied the December 3, 2103 Order of Court at issue here.

Importantly, and as noted above in the standard of review, this Court may only deem a factual finding to be "clearly erroneous" if the Court is left with a definite and firm conviction that a mistake has been committed. *In re W.R. Grace & Co.*, 729 F.3d 311, 319, n.14 (3d Cir. 2011); *see also Gordon v. Lewistown Hosp.*, 423 F.3d 184, 201 (3d Cir. 2005). Here, it is this Court's responsibility, under the clearly erroneous standard, to accept the ultimate factual determinations of the Bankruptcy Court unless that determination is either: (1) completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data. *DiFederico v. Rolm Co.*, 201 F.3d 200, 208 (3d Cir. 2000) (citations omitted).

Neither of the two criteria have been met by Rock Airport or RPP in this case. Accordingly, this Court cannot find that the Bankruptcy Court's December 3, 2013 Order was clearly erroneous for the reasons suggested by Rock Airport and RPP, and thus, it declines to disturb that decision.

---

[4] Although Rock Airport and RPP delineated seven points which, they argue, illustrate that the Bankruptcy Court rendered a clearly erroneous decision through its the December 3, 2013 Order, this Court believes that the seven are collapsible into the three topics outlined immediately above.

**IV. Conclusion**

The Court will affirm the final judgment of the Bankruptcy Court as expressed in its

December 3, 2013 Order and accompanying Memorandum Opinion.  An appropriate Order shall

follow.

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge
